## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE, | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware Corporation, | ) |
| et al., | ) Jointly Administered |
| | ) |
| Debtors. | ) |
| | ) |
| BROADHOLLOW FUNDING, LLC; | ) |
| MELVILLE FUNDING, LLC; AND | ) |
| AMERICAN HOME MORTGAGE | ) |
| SERVICING, INC. (f/k/a COLUMBIA | ) |
| NATIONAL INCORPORTED), | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Adv. Proc. No. 07-51738 (CSS) |
| | ) |
| BANK OF AMERICA, N.A. | ) |
| | ) |
| Defendant. | ) |

## <u>OPINION</u>[1]

| | |
|---|---|
| Laurie Selber Silverstein | John T. Dorsey |
| Gabriel R. MacConaill | Erin D. Edwards |
| Potter, Anderson & Corroon LLP | Young, Conaway, Stargatt |
| P.O. Box 951 | & Taylor, LLP |
| 1313 N. Market Street, 6th Floor | 1000 West Street, 17th Floor |
| Wilmington, DE 19899 | Wilmington, DE 19801 |
| | |
| - and- | - and- |
| | |
| Margot B. Schonholt | Susheel Kirpalani |
| Myron Kirschbaum | James C. Tecce (Argued) |
| Aaron Rubinstein (Argued) | |
| Scott D. Talmadge | |

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

Kaye Scholer LLP                       Quinn, Emanuel, Urquhart,
425 Park Avenue                        Oliver & Hedges, LLP
New York, NY 10022                     51 Madison Avenue, 22nd Floor
                                       New York, NY 10010


Counsel for Bank of America, N.A.      Counsel for Broadhollow
                                       Funding, LLC; Melville Funding,
                                       LLC; and American Home
                                       Mortgage Servicing, Inc. (f/k/a
                                       Columbia National Incorported),


Dated: June 27, 2008

Sontchi, J. _Clfdh Shtc_____

## INTRODUCTION

### I.  General Introduction

Before the Court is a motion by Bank of America, N.A. to dismiss the

adversary proceeding filed against it by Broadhollow Funding, LLC, Melville

Funding, LLC and American Home Mortgage Servicing, Inc. (collectively

"Plaintiffs"). Bank of America, N.A. argues that American Home Mortgage

Servicing, Inc., which is the only one of the Plaintiffs in bankruptcy, lacks

standing to bring this action because it is a stranger to the contracts between

Bank of America, N.A. and Broadhollow Funding, LLC and Melville Funding,

LLC., two non-debtor special purpose entities. Furthermore, Bank of America,

N.A. argues that the adversary proceeding should be dismissed as to all Plaintiffs

because this Court lacks subject matter jurisdiction over the proceeding. In the

alternative, Bank of America, N.A. argues that this Court should exercise its

discretion to abstain from hearing this proceeding under 28 U.S.C. § 1334(c)(1).

The Court finds that, at minimum, it has "related to" jurisdiction over this proceeding. The Court further finds, however, that American Home Mortgage Servicing, Inc. lacks standing to bring this adversary proceeding and its claims will be dismissed. Finally, the Court will not abstain from considering the remaining claims in this proceeding under 28 U.S.C. § 1334(c)(1).

## II.  Securitizations

The facts of this adversary proceeding center on a warehouse securitization program involving certain of the debtors, the non-debtor special purpose entities, and Bank of America, N.A. The debtors used this warehouse securitization program to finance a portion of their mortgage origination business. Financing through securitization is a relatively recent phenomenon.[2] In the typical securitization transaction, the company that wants to obtain financing first identifies assets on the company's balance sheet that can be used to raise funds.[3] Assets that are appropriate for securitization are usually income producing assets, e.g., accounts receivable, lease rentals, or mortgage loans.[4] Once appropriate assets are identified, the company sells the assets to a special purpose vehicle or entity (i.e., SPV or SPE), which in turn transfers the assets to another SPE.[5] The second SPE raises funds to pay the first SPE for these assets

---

[2] The first transaction to be deemed a structured financing took place in the early 1970s. Steven L. Schwarcz, *Structured Finance: The New Way to Securitize Assets*, 11 Cardozo L. Rev. 607, 609 (1990).

[3] Steven L. Schwarcz, *The Alchemy of Asset Securitization*, 1 Stan. J.L. Bus. & Fin. 133, 135 (1994).

[4] *Id.*

[5] Steven L. Schwarcz, *Securitization Post-Enron*, 25 Cardozo L. Rev. 1539, 1540 (2004).

by issuing securities to the public.[6]  The first SPE then uses the funds it receives from the second SPE to pay back the company; and the second SPE uses the funds generated by the income producing assets to repay the investors that purchased its securities.[7]

Companies enter into securitization transactions primarily because they offer cost savings over traditional capital raising techniques.[8]  Traditionally, when a company raises capital the company issues debt or debt-like securities with a credit rating tied to the company's credit worthiness.[9]  With securitization, however, the SPE and its assets are separate from the general risks of the company and, therefore, the SPE's debt or debt securities are based on the assets themselves and may receive a higher credit rating.[10]  With this higher credit rating comes a lower interest cost.[11]  Therefore, a company seeking to raise capital will use securitization when the interest and transaction costs of the securitized transaction are less than the interest and transaction costs of traditional financing methods.[12]

---

[6] *Id.*

[7] *Id.*

[8] Steven L. Schwarcz, *The Alchemy of Asset Securitization*, 1 Stan. J.L. Bus. & Fin. 133, 136-138 (1994).

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.*

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual Background[13]

The specific warehouse securitization program used by debtors functioned through three sets of agreements. The relevant parties to the agreements are: (1) Broadhollow Funding, LLC, a special purpose entity and non-debtor plaintiff ("Broadhollow");[14] (2) Melville Funding, LLC, a special purpose entity and non-debtor plaintiff ("Melville");[15] (3) American Home Mortgage Servicing, Inc., a debtor and plaintiff in this adversary proceeding ("AHMSI");[16] (4) Bank of America, N.A., the defendant and party to two of the three relevant agreements ("BofA" or "Bank of America");[17] (5) American Home Mortgage Corp., a debtor in these chapter 11 cases and the manager of Broadhollow Funding, LLC but not a party to this proceeding ("AHMC"), and[18] (6) American Home Mortgage Acceptance, Inc., a debtor in these chapter 11 cases and the manager of Melville Funding, LLC but not a party to this proceeding ("AHMA").[19]

The first set of agreements used in the debtors' warehouse securitization program were two mortgage loan purchase and servicing agreements

---

[13] The facts set forth herein are derived from the Amended Complaint.

[14] Amended Complaint, ¶ 5.

[15] *Id.*, ¶ 6.

[16] *Id.*, ¶ 4.

[17] *Id.*, ¶¶ 9 and 20.

[18] *Id.*, ¶ 5.

[19] *Id.*, ¶ 6.

("MLPSA") - - the Broadhollow MLPSA and the Melville MLPSA.[20]  The parties

to the Broadhollow MLPSA were Broadhollow and AHMC.[21]  The parties to the

Melville MLPSA were Melville and AHMA.[22]  Additionally, Columbia National

Incorporated ("CNI") was a party to both the Broadhollow and Melville MLPSAs

as the servicer under the agreements.[23]

Under each MLPSA, the seller (i.e., AHMC or AHMA) would sell to

Broadhollow or Melville newly originated first mortgage loans.[24]   As of

September, 2007, Broadhollow and Melville owned approximately 5,700

mortgage loans with an aggregate unpaid principal balance of approximately

$1.62 billion.[25]   In order to fund the acquisition of  mortgage loans, Melville

issued a single variable funding note to Broadhollow.[26]    In exchange,

Broadhollow extended a loan to Melville in the original principal amount of $168

million.[27]   Melville used the proceeds of the single variable funding note to

purchase the mortgage loans from AHMA.[28]   In order to fund its acquisition of

mortgage loans, Broadhollow issued commercial paper in the form of secured

---

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*  AHMSI is the successor to CNI.  *Id.*, ¶ 4.

[24] *Id.*, ¶ 15.  Specifically, AHMC sold mortgage loans to Broadhollow and AHMA sold mortgage loans to Melville.

[25] *Id.*

[26] *Id.*, ¶ 17.

[27] *Id.*

[28] *Id.*

liquidity notes (secured by liens on the mortgage loans).[29]   Broadhollow also issued subordinated notes, which were likewise secured by the mortgage loans.[30]

As discussed above, the two MLPSAs described the terms under which AHMC and AHMA sold mortgage loans to Broadhollow and Melville, respectively.   Under the MLPSAs, if a "termination event" (as defined by the MLPSAs) occurred, the servicer, i.e., AHMSI, was required to sell or securitize the mortgage loans held by Broadhollow and Melville.[31]

Pre-petition, a "termination event" occurred under both the Broadhollow and Melville MLPSAs.[32]   This "termination event," required AHMSI to sell the mortgage loans.[33]   The debtors conducted this sale process from mid-August 2007 to late September 2007.[34]   On September 26, 2007, the debtors conducted an auction of the mortgage loans, and each mortgage loan was sold for less than par value.[35]

---

[29] *Id.*, ¶ 18.

[30] *Id.*

[31] *Id.*, ¶¶ 26-27.

[32] *Id.*, ¶ 32.  Specifically, there was a failure to maintain the required amount of swap agreements. *Id.*

[33] *Id.*, ¶¶ 32-33.

[34] *Id.*, ¶ 34.

[35] *Id.*  Specifically, the following bids (as a percentage of par value) constituted the "highest and best" offers for the respective mortgage loans:

- Broadhollow Non-Agency Performing Loans: 90.8%
- Broadhollow Agency Performing Loans: 89.25%
- Melville Non-Agency Performing Loans: 85%
- Melville Agency Performing Loans: 80%
- Broadhollow Non-Performing Loans: 58.71%

In addition to the MLPSAs, Broadhollow and Melville entered into forward swap agreements with highly-rated financial institutions (the "Broadhollow/Melville Swap Counterparties").[36]    Broadhollow and Melville entered into these agreements to enhance the quality of the commercial paper and securities they issued, and to mitigate against interest rate risks and risks not associated with homeowner delinquencies and defaults.[37]    Bank of America was among the Broadhollow/Melville Swap Counterparties.[38]    Specifically, Broadhollow and BofA entered into the International Swap Dealers Association, Inc. ISDA Master Agreement among Broadhollow and BofA, and Melville and BofA entered into the International Swap Dealers Association, Inc. ISDA Master Agreement among Melville and BofA (together the "Forward Swaps").[39]

Under the Forward Swaps, a two-part transaction occurred on a monthly basis: (1) Broadhollow or Melville, as appropriate, would pay BofA the interest received on the mortgage loans,[40] and (2) Broadhollow or Melville, as appropriate, would receive from BofA a floating rate payment equal to their respective cost of funds, i.e., interest owing on the commercial paper and subordinated notes issued by Broadhollow.[41]

---

- Melville Non-Performing Loans: 53.63%

[36] *Id.*, ¶¶ 2-3.

[37] *Id.*, ¶ 2.

[38] *Id.*, ¶ 3.

[39] *Id.*, ¶ 20.  *See also Id.*, Exhibits C and D.

[40] Net of any servicing fees received during the period.  *Id.*, ¶ 13.

[41] *Id.*, ¶ 13.

As stated earlier, a "termination event" occurred under both the Broadhollow and Melville MLPSAs and, accordingly, AHMSI was forced to sell and auction the mortgage loans held by Broadhollow and Melville. This sale and auction of the mortgage loans triggered provisions in the Forward Swaps. Specifically, the provisions provided that when either Broadhollow or Melville decided to sell or securitize one or more of the mortgages it owned, Broadhollow or Melville was required to either (a) pay BofA for any gains realized in excess of the price Broadhollow or Melville originally paid for the mortgage loans, or (b) if the price received by Broadhollow or Melville for the mortgage loans was less than the original cost of the mortgage loans, Broadhollow or Melville, as appropriate, would receive payment from BofA equal to that shortfall to the extent it was not related to homeowner non-payment.[42] The payments from BofA to Broadhollow or Melville are defined as "Partial Termination Payments."[43]

According to the Plaintiffs, because the mortgage loans were sold for less than par value at the September 26, 2007 auction, Partial Termination Payments became due and owing from BofA under the Forward Swaps.[44] The debtors requested these payments from BofA twice in early October, 2007.[45] In October, BofA advised the Debtors that BofA would not pay the Partial Termination

---

[42] *Id.,* ¶ 14.

[43] *Id.,* ¶ 29.

[44] *Id.,* ¶ 35.

[45] *Id.*

Payments because the mortgage loans sold at auction did not comply with the debtors' representations and warranties to Broadhollow and Melville under the MLPSAs.[46]  In addition to the Partial Termination Payments, the debtors allege that BofA owes various interest payments to Broadhollow and Melville due under the Forward Swaps ("Interest Related Payments").[47]

The final set of agreements is the back swap agreements (the "Back Swaps").  The Back Swaps were agreements between a debtor entity and each of the Broadhollow/Melville Swap Counterparties, including BofA.[48]  Under the Back Swaps, the debtor entity was obligated to reimburse the appropriate Broadhollow/Melville Swap Counterparty [e.g., BofA] for any payment made to Broadhollow or Melville under the Forward Swaps.[49]

## II.  Procedural Background

This adversary proceeding was commenced when the Plaintiffs filed a complaint (subsequently amended) against Bank of America ("Amended Complaint").[50]  In the Amended Complaint, the Plaintiffs allege that BofA breached the Forward Swaps by failing to pay the appropriate amount of Partial Termination Payments and Interest Related Payments under the Forward Swaps.

---

[46] *Id.*, ¶ 36.

[47] *Id.*, ¶¶ 31 and 39.  The Debtors allege BofA owes Broadhollow and Melville Interest Related Payments of approximately $1.6 million and $13,000, respectively.

[48] *Id.*, ¶ 14.  The Debtor entities that were party to the Back Swaps were Columbia National Incorporated, American Home Investment Corporation and AHMSI.  *Id.*, ¶ 9.

[49] *Id.*

[50] [Docket Entry 4].

Bank of America moved to dismiss the Amended Complaint. [51] and filed its opening brief in support of its motion ("Opening Brief").[52]    Specifically, BofA argues that the Court should dismiss the Amended Complaint under Rule 12(b) of the Federal Rules of Civil Procedure, which is made applicable to this case by Rule 7012 of the Federal Rules of Bankruptcy Procedure, as to Plaintiff AHMSI because AHMSI has no standing to bring this action.[53]    Additionally, BofA argues that the Court should dismiss the Amended Complaint under Rule 12(b)(1) as to all Plaintiffs because the Court lacks subject matter jurisdiction over the adversary proceeding.[54]    Alternatively, BofA argues that the Court should abstain from hearing this proceeding under 28 U.S.C. § 1334(c)(1).[55]    The Plaintiffs subsequently filed a response ("Answering Brief").[56]    Finally, BofA filed a reply ("BofA Reply").[57]    The Court heard oral argument in early May. This matter is now ripe for decision.

---

[51] [Docket Entry 8]

[52] [Docket Entry 9].

[53]  Opening Brief, pp. 4-5

[54] *Id.*, pp. 5-8.

[55] *Id.*, pp. 11-14.

[56] [Docket Entry 10].

[57] [Docket Entry 19].

## DISCUSSION

### I.  The Standard for Evaluating a Motion to Dismiss for Lack of Subject Matter Jurisdiction Under Rule 12(b)(1) of The Federal Rules Of Civil Procedure

Rule 12(b) (1) of the Federal Rules of Civil Procedure allows a party to bring a motion to dismiss for lack of subject matter jurisdiction.[58]  "A motion to dismiss for want of standing is also properly brought pursuant to Rule 12(b)(1), because standing is a jurisdictional matter."[59]  Once a party moves to dismiss for lack of subject matter jurisdiction, the movant has the choice to proceed under either of two options.   The first option is for the movant to challenge the sufficiency, but not the accuracy, of the facts alleged in the complaint.[60]  If the movant proceeds under this option, the court will presume that all the facts in the complaint are true.[61]  However, if the defendant challenges the accuracy of the complaint's factual allegations, the court must no longer presume their validity.[62]  Here, Bank of America does not challenge the Amended Complaint's factual allegations.   Accordingly, when considering BofA's Motion to Dismiss, the Court will accept as true all the factual allegations contained in the Amended

---

[58] Fed.R.Civ.P. 12(b)(1).

[59] *Ballentine v. U.S.*, 486 F.3d 806, 810 (3d Cir. 2007).

[60] *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 290 (3d Cir. 2006).

[61] *Id.*

[62] *Mortensen v. First Fed. Sav. and Loan Ass'n.*, 549 F.2d 884, 891 (3d Cir. 1977) ("Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction its very power to hear the case there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.   In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims.").

Complaint.[63]   While the Court will accept the Plaintiffs' factual allegations as true, it remains Plaintiffs' burden to prove that the Court has subject matter jurisdiction over this adversary proceeding and that AHMSI has standing to bring this action.[64]

## II.  The Court Has Subject Matter Jurisdiction Over This Proceeding.

### a.  Bankruptcy Court Jurisdiction

Bank of America argues that the Court should dismiss the Amended Complaint because the Court does not have subject matter jurisdiction over this dispute.   Under 28 U.S.C. § 1334, "the district courts shall have original and exclusive jurisdiction of all cases under title 11 ... [and] original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."[65]   Under 28 U.S.C. §157(a), the district court may provide that any and all cases under title 11 and any and all proceedings under title 11 are arising in or related to a case under title 11 shall be referred to the bankruptcy court for the district.   The United States District Court for the District of Delaware has so provided.

Bankruptcy Court jurisdiction extends to four types of matters: (1) cases under title 11, (2) proceedings arising under title 11, (3) proceedings arising in a

---

[63] *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 290 (3d Cir. 2006).

[64] *Ballentine v. U.S.*, 486 F.3d at, 810; and *In re Bayview Plaza Assocs. Ltd. P'ship*, 209 B.R. 840, 841 (Bankr. D. Del. 1997) (plaintiff bears the burden to show that the court has subject matter jurisdiction over a proceeding.).

[65] 28 U.S.C. §§ 1334(a) and (b).

case under title 11, and (4) proceedings related to a case under title 11.[66] Assuming the district court has subject-matter jurisdiction, a related question arises - whether the matter before the bankruptcy court is a core or non-core proceeding under 28 U.S.C. § 157(b).  Importantly, 28 U.S.C. §157(b) is not an independent basis for conferring subject-matter jurisdiction to a bankruptcy court.  Rather, 28 U.S.C. §157(b) delineates the scope of the bankruptcy court's power to exercise the subject-matter jurisdiction granted to the district court under 28 U.S.C. §1334.[67]

In "core" proceedings, the Bankruptcy Court takes on "the role of a court of first instance with comprehensive power to hear, decide and enter final orders and judgments."[68]  With "non-core" matters, the Bankruptcy Court is permitted only to hear the dispute and submit "proposed findings of facts and conclusions of law to the district court."[69]  Generally, "core" proceedings include: (1) cases under title 11, (2) proceedings arising under title 11, and (3) proceedings arising in a case under title 11,  "and non-core" proceedings include proceedings which are "related to a case under title 11."[70] If a matter fails to fall into any of the four categories of subject matter jurisdiction, whether the proceeding is "core" nor

---

[66] *Id.*; and *Binder v. Price Waterhouse & Co., LLP, (In re Resorts Int'l., Inc.)*, 372 F.3d 154, 162 (3d Cir. 2004).

[67] *In re RNI Wind Down Corp.*, 348 B.R. 286, 292 (Bankr. D. Del. 2006).

[68] *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999).

[69] *Id.* (quoting 28 U.S.C. § 157(c)(1)).

[70] *In re Resorts Int'l., Inc.*, 372 F.3d at 162.

"non-core," is irrelevant and the bankruptcy court does not have jurisdiction over the matter.[71]

As discussed more fully below, "related to" jurisdiction is the most expansive of all four types of bankruptcy court jurisdiction.[72]  As a result, while it is the Plaintiffs' burden to establish that this Court has jurisdiction over this matter, it need only show that this proceeding is at least "related to" a case under title 11 to survive the Bank of America's motion to dismiss for lack of subject matter jurisdiction.[73]

### b. At Minimum, The Court Has "Related To" Jurisdiction Over This Proceeding.

The Third Circuit set forth in *Pacor* what has become the seminal test to determine whether a proceeding is "related to" a bankruptcy case.[74]  Under *Pacor*, a proceeding is "related to" a bankruptcy case if "*the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy.*"[75]  Furthermore, "[a] key word in this test is 'conceivable.' Certainty, or even likelihood, is not a requirement."[76]  However, "the mere fact that there may be common issues of fact between a civil proceeding and a

---

[71] *Celotex Corp. v. AIU Ins. Co. (In re Celotex Corp.)*, 152 B.R. 667, 671-672 (Bankr. M.D. Fla. 1993).

[72] *In re Resorts Int'l., Inc*, 372 F.3d at 163 ("Non-core 'related to' jurisdiction is the broadest of the potential paths to bankruptcy jurisdiction… .").

[73] *Geruschat v. Ernst Young LLP (In re Seven Fields Development Corp.)*,  505 F.3d 237, 257 (3d Cir. 2007).

[74] *In re Resorts, Int'l., Inc.*, 372 F.3d at 164.

[75] *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984) (reversed on other grounds) (emphasis in original).

[76] *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 264 (3d Cir. 1991).

controversy involving the bankruptcy estate does not bring the matter within the scope of section [1334(b)]."[77]

As described in the Amended Complaint, after a "termination event" occurred under the MLPSAs, AHMSI was forced to sell and auction the mortgage loans owned by Broadhollow and Melville. Generally, when mortgage loans owned by Melville or Broadhollow were sold or securitized, the Forward Swaps required Broadhollow or Melville, as appropriate, to pay Partial Termination Payments to Bank of America, or vice versa.[78] Specifically, if the mortgage loans were sold for below par value BofA was required pay Partial Termination Payments to Broadhollow or Melville, as appropriate. And, if the Mortgage Loans were sold for above par value Broadhollow or Melville, as appropriate, was required to pay Partial Termination Payments to BofA. In this adversary proceeding, the Plaintiffs allege that the mortgage loans were sold at below par value and, therefore, Partial Termination and Interest Related Payments became due and owing from Bank of America.

The Forward Swaps, however, are just one set in a series of contracts the debtors' and their SPE's entered into to effectuate their warehouse securitization program. While each contract primarily served its own distinct purpose, two contracts -- the Forward Swaps and Back Swaps -- were closely related in one

---

[77] *Pacor*, 743 F.2d 984 at 994. In *Pacor*, the Third Circuit was interpreting the language of 28 U.S.C. §1471. This language was subsequently transferred to 28 U.S.C. §1334(b). Pub. L. No. 98-353, 98 333, sec. 101(a).

[78] In addition to Partial Termination Payments, Interest-Related Payments were also required.

respect.    The Back Swaps were contracts entered into between the Broadhollow/Melville Swap Counterparties (e.g., BofA) and the debtors.[79]    The Plaintiffs argue that this relationship between the Forward and Back Swaps makes this dispute "related to" the bankruptcy case.   Specifically, the Plaintiffs argue that this dispute will determine the amount BofA owes Broadhollow and Melville under the Forward Swaps which, in turn, will determine the amount the debtors owe BofA under the Back Swaps.[80]    Therefore, the Plaintiffs argue this dispute affects Bank of America's standing as a creditor and, thus, the administration of the debtors' estate.[81]    Accordingly, the Plaintiffs argue that this Court has at least "related to" jurisdiction over this proceeding.[82]

Bank of America disagrees with this argument.   Under Bank of America's view of "related to" jurisdiction, as delineated by *Pacor*, if the outcome of a proceeding does not *automatically* affect the estate being administered in bankruptcy, "related to" jurisdiction does not exist.    BofA argues that the connection between the Forward Swaps and Back Swaps does not create "related to" jurisdiction because any claim BofA may have against the debtors under the Back Swaps will be subject to a myriad of defenses that the debtors could raise against BofA's claim.   Therefore, because the ultimate resolution of any claim by

---

[79] Amended Complaint, ¶¶ 9 and 14.

[80] Answering Brief, pp. 23-24.

[81] *Id.*, pp. 22-24 and 26.

[82] The Plaintiffs also argue that this Court has "core" jurisdiction over this dispute.  *Id.*  But, as discussed above, whether a proceeding is core is not a matter of jurisdictional significance. Moreover, on a motion to dismiss, this Court need only consider whether the Court has "related to" jurisdiction over the dispute.

BofA under the Back Swaps may require litigation, the result of this proceeding before the Court will not *automatically* affect the estate.   Thus,  Bank of America argues  that  the  proceeding  is  not  "related  to"  the  debtor's  bankruptcy.    The Court disagrees.

As  discussed  above,  courts  interpreting  *Pacor's*  test  for  "related  to" jurisdiction  have  determined  that  "[a]  key  word  in  this  test  is  'conceivable.' Certainty, or even likelihood, is not a requirement."[83]   The Court recognizes that many  of  the  cases  applying  the  *Pacor*  test  have  declined  to  find  "related  to" jurisdiction.[84]   The cases where "related to" jurisdiction is found, however, do not  require the sort of *automatic* effect on the bankruptcy estate urged by Bank of America.

In *Belcufine v. Aloe*, the Third Circuit faced the question of whether a state law dispute between former employees of a chapter 11 debtor and the debtor's officers was "related to" the debtor's bankruptcy case.[85]   In that case, the former employees sued the debtor's officers in state court under a Pennsylvania law that imposes personal liability on a corporation's top officers for wages and benefits the  corporation  fails  to  pay  to  its  employees.    The  action  was  subsequently removed  to  the  bankruptcy  court  handling  the  debtor's  chapter  11  case.    The bankruptcy  court  ruled  in  favor  of  the  officers,  and  the  former  employees

---

[83] *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d at 264.

[84] *See e.g., In re Combustion Engineering, Inc.*, 391 F.3d 190, 228-232 (3d Cir. 2004); *Torkelsen v. Maggio (In re The Guild and Gallery Plus, Inc.)*, 72 F.3d 1171,1182 (3d Cir. 1996); and *Pacor,* 743 F.2d at 996.

[85] *Belcufine v. Aloe*, 112 F.3d 633 (3d Cir. 1997).

appealed to the district court.  On appeal, the former employees argued that the bankruptcy court lacked subject matter jurisdiction over the dispute.  The district court reasoned that "related to" jurisdiction existed because, if the former employees were to prevail against the officers, the debtor's by-laws provided that the officers could seek an indemnification claim against the debtor for any amount the former employees recovered.  Thus, the district court continued, the "existence of this indemnification claim demonstrated that the employees' claims against the [officers] could conceivably have an effect on the bankruptcy estate and therefore satisfied the 'related to' test."[86]

The former employees then appealed to the Third Circuit and presented two arguments for why the bankruptcy court did not have subject matter jurisdiction over their claim against the officers.  First, they argued that the bankruptcy court lacked jurisdiction because the officers' claim for indemnification against the chapter 11 debtor was barred by 11 U.S.C. § 502(e)(1)(B) as a contingent claim against a bankruptcy estate.  Second, they argued that the officers' indemnity claim was barred by the terms of the chapter 11 debtor's confirmed plan because the officers did not timely file a proof of claim.

As such, the former employees' argument in *Belcufine* was very similar to the argument put forward here by Bank of America.  In *Belcufine*, the former employees argued that even if they were successful against the officers, their

---

[86] *Id.*

dispute with the officers was not "related to" the debtor's bankruptcy case because the officers were barred from asserting indemnification claims against the chapter 11 debtor.  Here, Bank of America argues that even if Broadhollow and Melville recover under the Forward Swaps and Bank of America asserts a claim against the Debtors for amounts owing under the Back Swaps, this dispute is not "related to" the Debtors' bankruptcy case because the Debtors will defend against any claim Bank of America brings under the Back Swaps.  In *Belcufine*, despite the possible defenses the chapter 11 debtor might assert against the officers' indemnification claims, i.e., the effect was not "automatic," the Third Circuit held that the dispute between the former employees and the officers was "related to" the debtor's bankruptcy case.  Therefore, for "related to" jurisdiction to exist, the effect on the estate need not be automatic as Bank of America claims.[87]

Having disposed of the argument that "related to" jurisdiction requires that the effect on the estate must be "automatic," the Court turns to the question of whether the proceeding between Broadhollow, Melville and AHMSI against Bank of America is nonetheless "related to" the Debtors' bankruptcy case.  As discussed above, under *Pacor*, a proceeding is "related to" a bankruptcy case if "*the outcome of that proceeding could conceivably have any effect on the estate being*

---

[87] *See also In re Velocita Corp.*, 169 Fed.Appx. 712, 716 (3d Cir. 2006).  In this case, the Third Circuit held that a state court dispute between two non-debtors was "related to" the underlying bankruptcy case because it *might* affect *objections* to fee applications and plan confirmation pending in the bankruptcy case as opposed to resulting in an automatic disposition of the underlying fee applications and plan.

*administered in bankruptcy.*[88]   Furthermore, "whether a lawsuit could 'conceivably' have an effect on the bankruptcy proceeding inquires whether the allegedly related lawsuit would affect the bankruptcy proceeding without the intervention of yet another lawsuit."[89]

In *Pacor*, John and Laurie Higgins brought a state court action against Pacor, Inc. ("Pacor") for asbestos-related injuries allegedly caused by exposure to Pacor's products.[90]   In response, Pacor filed a third-party complaint against Johns-Manville, the initial manufacturer of Pacor's products.   Johns-Manville subsequently filed for bankruptcy, and Pacor sought to remove the Higgins-Pacor action to the bankruptcy court presiding over the Johns-Manville case.   The issue before the Third Circuit was whether the litigation the Higgins-Pacor litigation was "related to" the Johns-Manville bankruptcy proceeding.

The Third Circuit reasoned that the Higgins-Pacor litigation was "[a]t best … a mere precursor to the potential third party claim for indemnification by Pacor against Manville… [and] any judgment received by the plaintiff Higgins could not itself result in even a contingent claim against Manville, since Pacor would still be obligated to bring an entirely separate proceeding to receive

---

[88] *Id.*

[89] *In re Federal-Mogul Global, Inc.*, 300 F.3d 368, 382 (3d Cir. 2002).  *See also In re Combustion Engineering, Inc.*, 391 F.3d 190, 232 (3d Cir. 2004) ("Moreover, any indemnification claims against Combustion Engineering resulting from a shared production facility would require the intervention of another lawsuit to affect the bankruptcy estate, and thus cannot provide a basis for 'related to' jurisdiction.").

[90] *Pacor,* 743 F.2d at 986.

indemnification."[91]   Therefore, the Third Circuit found that the Higgins-Pacor dispute was not "related to" the Manville bankruptcy because the dispute would not affect the Manville bankruptcy regardless of whether Higgins or Pacor prevailed.   However, here it is conceivable that the Plaintiffs' adversary proceeding will affect the debtors' bankruptcy case.

In this adversary proceeding, the Plaintiffs allege that Bank of America breached the Forward Swaps by failing to pay additional Partial Termination and Interest Related Payments to Broadhollow and Melville.  Accordingly, if the Plaintiffs prevail, Bank of America will be required to make additional payments under the Forward Swaps.  As discussed above, if a payment is made to Bank of America under the Forward Swaps, the terms of the Back Swaps provide that a corresponding payment is due to Bank of America from the debtor-counterparty to Bank of America under the Back Swaps.  Therefore, if the Plaintiffs prevail in this adversary proceeding, certain debtors will become obligated to Bank of America under the Back Swaps.   If this obligation does arise, it will arise contractually and, unlike *Pacor*, without the intervention of another lawsuit. Furthermore, if the obligation does arise it will conceivably affect the debtors' bankruptcy estate.  If Bank of America has a claim under the Back Swaps against any of the debtors, it can file that claim and it will be resolved in the claim resolution process.  While the debtors may object to Bank of America's claim and litigation over the claim may result, it is conceivable that the claim will be

---

[91] *Id.* at 995.

allowed.    Accordingly, it is within the bounds of conceivability that this adversary proceeding will affect the debtors' bankruptcy case.    As such, this proceeding is "related to" the debtors' bankruptcy.

As an additional basis for this Court's jurisdiction, the Plaintiffs' argue that Broadhollow and Melville are owned by AHMA and AHMC (both of which are debtors), and that this equity interest makes this proceeding "related to" the debtors' bankruptcy case.[92]   A similar argument, however, was rejected by Chief Judge Walrath in *DVI*.[93]

In *DVI*, the debtors provided lease and loan financing to healthcare providers for the acquisition of medical equipment.   The debtors would often sell the leases and loans they originated to separately incorporated, non-debtor special purpose vehicles.   While the debtors did not retain title to the leases and loans sold to the special purpose vehicles, they retained the right to service the loans and leases.   Post-petition, one of the debtors filed a complaint against a health care provider that had defaulted previously on certain equipment leases. The health care provider argued that the court lacked subject matter jurisdiction because the debtors' rights and interests in the loans and leases were sold prepetition to the special purpose vehicles, and, therefore, neither the loans nor

---

[92] <u>Answering Brief, pp. 25-26</u>.

[93] *DVI Fin. Servs., Inc., v. National Med. Imaging, LLC (In re DVI, Inc.)*, 305 B.R. 414 (Bankr. D. Del. 2004).

the amounts the debtors sought to collect under them were property of the estate.  The debtors argued the following:

> DVIFS argues that this adversary proceeding [meets] the *Pacor* test because DVIFS holds an equity and debt interest in the Securitization Trusts which it considers to be valuable assets of its estate. It asserts that upon liquidation of the Securitization Trusts and payment of the Trusts' creditors, DVIFS will be entitled to the remaining assets which will be available to pay its creditors. Therefore, it asserts that the estate has a significant interest in maximizing the collection of the accounts receivable which the Trusts own.[94]

While the facts of *DVI* are similar to the facts presented in this case, the Court reaches a different result -- not because the Court disagrees with *DVI*, but, rather, because there are additional facts in this case that lead the Court to find that this proceeding is "related to" the debtors' bankruptcy case.  In *DVI*, the debtor argued that its equity interest in the securitization trusts brought the proceeding within the court's "related to" jurisdiction.  While the Plaintiffs put forward a similar argument, they also argue that the relationship between the Back Swap and Forward Swap agreements brings this dispute within the Court's "related to" jurisdiction.  As discussed more fully above, one potential result of this dispute is that the Court could find that Bank of America owes Broadhollow and Melville additional payments under the Forward Swaps.  As a result, the debtor-counterparty to Bank of America on the Back Swaps will become contractually obligated to make an equal payment to Bank of America.  Unlike the equity interest in *DVI* which was "too tenuous and insufficient to confer

---

[94] *Id.*at 418 (internal citations omitted).

jurisdiction,"[95] this dispute could create a contractual obligation for the debtor-counterparty to make payments to Bank of America on the Back Swaps. Accordingly, it is the presence of the Back Swaps that leads this Court to reach a result different from that in *DVI*.

The Court, at a minimum, has "related to" jurisdiction over this proceeding. Accordingly, Bank of America's motion to dismiss is denied to the extent is seeks to dismiss the Amended Complaint because the Court lacks subject matter jurisdiction.

## III.  AHMSI Lacks Standing To Bring This Action.

To determine whether AHMSI has standing to sue under the Forward Swaps, the Court is required to interpret the terms of the Forward Swaps. Under New York law,[96] "[w]hen interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized."[97] The starting point in gleaning

---

[95] *Id.*

[96] New York law controls the Forward Swaps.  <u>Amended Complaint, Exhibit C, Schedule p. 7 and Exhibit D, Schedule p. 7.</u>

[97] *Joseph v. Creek & Pines, Ltd.,*  217 A.D.2d 534 (N.Y. App. Div. 1995).

the parties' intent is the plain meaning of the contract's terms.

> Where the intention of the parties is clearly and unambiguously set
> forth, effect must be given to the intent as indicated by the
> language used. Finally, where the contract is clear and
> unambiguous on its face, the intent of the parties must be gleaned
> from within the four corners of the instrument.[98]

As the Court determines that the terms of the Forward Swaps are clear and
unambiguous, the Court will not look further for evidence of meaning.

As discussed earlier, AHMSI is party to the Back Swaps with BofA, and is
party to the MLPSAs with Broadhollow and Melville.  The agreements at the
center of this dispute, however, are the Forward Swaps, and AHMSI is not a
party to the Forward Swaps.  New York law only gives the right to enforce a
contract to the contracting parties and any intended third-party beneficiaries of
the contract.  Therefore, AHMSI, as neither,[99] must put forward some alternate
legal argument for why it has standing to enforce the Forward Swaps.[100]  The
Plaintiffs put forward a variety of arguments under which they attempt to show
that AHMSI has standing.[101] And, while the Plaintiffs never state it outright,

---

[98] *Fetner v. Fetner*, 293 A.D.2d 645, 741 N.Y.S.2d 256, 258 (N.Y. App. Div. 2002) (internal citations omitted).

[99] AHMSI does not allege AHMSI is an intended third party beneficiary to the Forward Swaps. *See* May 2, 2008 Hearing Transcript, [Docket Entry 26] p. 55 line 3 – 10.

[100] *Seaver v. Ransom*, 224 N.Y. 233, 237, 120 N.E. 639, 640 (N.Y. 1918) ("The general rule, both in law and equity was that privity between a plaintiff and a defendant is necessary to the maintenance of an action on the contract.") (internal citations omitted); *Castillo v. Tyson*, 268 A.D.2d 336, 337 (N.Y. App. Div. 2000); *Pile Foundation Const. Co., Inc. v. Berger, Lehman Assocs., P.C.*, 253 A.D.2d 484, 486 (N.Y. App. Div. 1998) ("Since it is undisputed that there was no contract between the plaintiff and the defendants, recovery is dependent upon a showing that the plaintiff was an intended third-party beneficiary of the contract between Metro-North and the defendants, and not merely an incidental beneficiary thereof.").

[101] Answering Brief, pp. 30-33.

their argument is, in effect, that the Forward Swaps, MLPSAs and Back Swap are one integrated contract. Such a result would allow AHMSI to sue under the Forward Swaps. Under New York law, multiple contracts executed as parts of a single transaction "may be considered in law as one agreement, but only if the parties so intended."[102] To determine the parties' intention, a court must examine the various instruments and the facts and circumstances at the time of execution.[103] As discussed earlier, the terms of the Forward Swaps are clear and unambiguous. Therefore, the Court will ascertain the intent of the parties from the language used to express their intent.

The Plaintiffs make several arguments that the contracts are integrated. First, the Plaintiffs direct the Court's attention to the Back Swaps to which AHMSI is counterparty to BofA.[104] As discussed earlier, the Back Swaps interrelate to the Forward Swaps in that any payment made by BofA under the Forward Swaps to either Broadhollow or Melville creates a parallel payment due from AHMSI to BofA.

Second, the Plaintiffs' direct the Court's attention to the MLPSAs. Specifically, the Plaintiffs focus on the provision of the MLPSAs that provides that AHMSI is authorized to "undertake any such action which it may deem necessary or desirable with respect to this Purchase Agreement and the rights

---

[102] *Lowell v. Twin Disc, Inc.,* 527 F.2d 767, 769 (2d Cir. 1975)

[103] *Camofi Master LDC v. College P'ship, Inc.,* 452 F.Supp.2d 462, 475 (S.D.N.Y. 2006); *Sample v. Gotham Football Club, Inc.,* 59 F.R.D. 160, 164 (S.D.N.Y. 1973).

[104] Answering Brief, p. 31.

and duties of the parties hereto."[105]   Furthermore, the MLPSAs trigger BofA's

obligation to make Partial Termination Payments under the Forward Swaps.

Third, the Plaintiffs direct the Court's attention to the provisions in the

Forward Swaps that provide AHMSI with certain rights under the Forward

Swaps.[106]

The plaintiffs in *W. Alton Jones Foundation v. Chevron U.S.A. Inc.*, (hereafter

"*Gulf Oil*") put forward an argument similar to Bank of America's.[107]   The

dispute in *Gulf Oil* arose out of a failed tender offer by Gulf Oil Company

("Gulf") for the stock of Cities Service Company ("Cities").   The merger plans

between the companies unraveled after the Federal Trade Commission objected

to the deal and then sued successfully to block it.   At this point, Gulf invoked a

"litigation out" provision in the offer to purchase the plaintiffs' shares in order to

terminate the agreement.   The plaintiffs argued that Gulf negotiated in bad faith

with the FTC so that Gulf could use the "litigation out."

The plaintiffs in *Gulf Oil* then attempted to sue Gulf under a "best efforts"

clause in the merger agreement.   Specifically, the plaintiffs argued that Gulf

failed to use best efforts to negotiate a settlement with the FTC.   The problem for

the plaintiffs, however, was that they were neither parties to the merger

agreement nor, as the court determined, third party beneficiaries under the

---

[105] Amended Complaint, ¶ 23.  *See also* Amended Complaint, Exhibit A, p. 59 (§ 9.3) and Exhibit B, p. 56 (§ 9.3).

[106] Answering Brief, p. 32.

[107] *W. Alton Jones Found. v. Chevron U.S.A. Inc. (In re Gulf Oil/Cities Serv. Tender Offer Lit.)*, 725 F.Supp. 712, 731 (S.D.N.Y. 1989).

merger agreement.  Nevertheless, the plaintiffs argued that they had standing to sue on the merger agreement because the merger agreement and the offer to purchase (to which the plaintiffs were party) should be considered a single agreement.

A significant factor in the *Gulf Oil* court's decision was that the merger agreement and purchase agreement both contained integration clauses.[108]  A standard integration clause provides that the parties to a contract agree that they are only bound by the contract and that all conditions, promises or representations are contained in the contract.[109]  The Forward Swaps contain such a clause.[110]  This is strong evidence that the parties to the Forward Swaps intended those agreements to be separate from any other agreements the parties might enter into.  But, in *Gulf Oil*, both the relevant agreements had integration clauses.  Here, the Forward Swaps have integration clauses but the MLPSAs do not.[111]  However, even if the Forward Swaps are the only agreements of the three which have integration clauses, that is still strong evidence that the Forward Swaps were intended to be separate from the MLPSAs and Back Swaps.

---

[108] *In re Gulf Oil/Cities Serv. Tender Offer Lit.*, 725 F.Supp. at 731 .

[109] 11 WILLISTON ON CONTRACTS § 33:21 (4th Edition).

[110] "Entire Agreement.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communications and prior writings with respect thereto." Amended Complaint, Exhibit C, p. 12 (§ 9(a)) and Exhibit D, p. 12 (§ 9(a)).

[111] The Court is unable to determine if the Back Swaps contain integration clauses because they are not attached to the Amended Complaint.

After interpreting the plain meaning, the court in *Gulf Oil* also analyzed the purpose of the merger and purchase agreements for further evidence of the parties' intent. Here, as in *Gulf Oil*, the purpose of the MLPSAs, Back Swaps and Forward Swaps is further evidence that the parties to the agreements intended the agreements to be separate.

Also strong evidence of the contracts' separateness is the purpose of each contract.[112] As discussed earlier, the MLPSAs were the vehicles by which AHMC and AHMA sold the mortgage loans to Broadhollow and Melville, respectively. Once Broadhollow and Melville acquired the mortgage loans, they entered into the Forward Swaps as a hedge against interest rate risk and risks that are not related to homeowner delinquencies and default.[113] The Back Swaps were entered into as a second hedging agreement between AHMSI, AHMIC, CNI and BofA.[114] Turning back to *Gulf Oil*, the court in that case saw the merger agreement and offer to purchase as two separate transactions. Specifically, "the Offer to Purchase was designed to effect the first phase of the $63 a share cash-out offer to the sole benefit of the Cities shareholders, while the Merger Agreement created the mechanism whereby the two companies could merge after the Offer to Purchase was successfully concluded."[115] While the Forward

---

[112] The purpose of contract interpretation is to divine the parties' intent. The contract's purpose, which in this case can be determined by the language used, is highly relevant in determining the parties' intent.

[113] Amended Complaint, ¶ 12.

[114] Amended Complaint, ¶¶ 9 and 14.

[115] *In re Gulf Oil/Cities Serv. Tender Offer Lit.*, 725 F.Supp. at 731.

Swaps, MLPSAs and Back Swaps served a completely different purpose from the offer to purchase and merger agreement in *Gulf Oil*, the three agreements at issue here are no more related to each other than the two agreements were in *Gulf Oil*. To the same extent the Forward Swaps, MLPSAs and Back Swaps are necessary to accomplish the Debtors' warehouse securitization program, so were the offer to purchase and merger agreement necessary to accomplish the merger in *Gulf Oil*.

As the *Gulf Oil* court concluded, so, too, does this Court:

> To the extent that plaintiffs are proposing that all contracts vaguely relating to the same deal should be read together in spite of explicit language to the contrary in those contracts, so that a party to only one of the contracts can willy-nilly enforce provisions of the other contract, that argument has absolutely no support in contract law…"[116]

Accordingly, AHMSI has no standing to bring this action, and Bank of America's motion to dismiss is granted to the extent it seeks to dismiss AHMSI's claims for lack of standing.

## IV. The Court Will Not Exercise Discretionary Abstention Under 28 U.S.C. § 1334(c)(1).

The Court previously found that, at minimum, it has "related to" jurisdiction over this proceeding. Bank of America asserts a related argument that this Court should exercise its discretion to abstain from hearing this case under 28 U.S.C. § 1334(c)(1).  Section 1334(c)(1) provides, in relevant part, that, "nothing in this section prevents a district court in the interest of justice, or in the

---

[116] *In re Gulf Oil/Cities Serv. Tender Offer Lit.*, 725 F.Supp. at 731-732.

interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."[117]   The following factors are examined by the court when considering whether to exercise its discretion to abstain from hearing a matter:

> (i) the effect on the efficient administration of the estate, (ii) the extent to which state law issues predominate over bankruptcy issues, (iii) the difficulty or unsettled nature of the applicable state law, (iv) the presence of a related proceeding commenced in state or other non-bankruptcy court, (v) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (vi) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (vii) the substance rather, than the form of an asserted "core" proceeding, (viii) the feasibility of severing state law claims from core bankruptcy matters to allow judgment to be entered in state court and enforced in bankruptcy court, (ix) the burden on the court's docket, (x) the likelihood that commencement of the proceeding in bankruptcy court involves forum shopping, (xi) the existence of the right to a trial by jury, and (xii) the presence of non-debtors in the proceeding.[118]

An examination of each of these factors reveals that the Court should not abstain from hearing the Amended Complaint.

(i) The Effect on the Efficient Administration of the Estate:  Considering how intertwined this proceeding is with both other proceedings before this Court and the proofs of claim filed in the debtors' case, keeping this proceeding in this Court will likely enhance the efficiency with which the debtors' estates are administered.  This factor weighs against abstention.

---

[117] 28 U.S.C. § 1334(c)(1).

[118] *Giuliano v. Legates (In re Legates)*, 381 B.R. 111, 117 (Bankr. D. Del. 2008).

(ii) The Extent to Which State Law Issues Predominate Over Bankruptcy Issues:  The Plaintiffs concede that state law issues predominate.  This factors weighs in favor of abstention.

(iii) The Difficulty or Unsettled Nature of the Applicable State Law:  Bank of America admits that the state law issue presented is fairly ordinary.  However, under *Integrated Health*, "even if a matter does not involve unsettled issues of state law, where the state law issues so predominate the proceeding… this factor weighs in favor of having the state court decide it."[119]   Therefore, this factor favors abstention.

(iv) The Presence of a Related Proceeding Commenced in State or Other Non-Bankruptcy Court: Bank of America admits that there is no related proceeding in state court.   "While this is a dispositive factor in mandatory abstention… it is not dispositive (but is only one factor) in considering discretionary abstention."[120]  Accordingly, this factor weighs against abstention.

(v) The Jurisdictional Basis, If Any, Other Than 28 U.S.C. § 1334:  Bank of America admits that diversity of citizenship is an alternate basis for federal jurisdiction over this suit.[121]  This factor weighs against abstention.

(vi)  The Degree of Relatedness or Remoteness of the Proceeding to the Main Bankruptcy Case:  As discussed more fully above, the result in this action

[119] *Official Comm. of Unsecured Creditors of Integrated Health Servs. Inc. v. Elkins (In re Integrated Health Servs. Inc.)*, 291 B.R. 615, 620 (Bankr. D. Del. 2003)).

[120] *Id.* at 621.

[121] Motion to Dismiss, p. 13.

could affect the debtors and Bank of America as a creditor of the debtors. Accordingly, this factor weighs against abstention.

(vii)    The Substance Rather, Than the Form of an Asserted "Core" Proceeding:  On a motion to dismiss, the Court is not required to decide whether this is a "core" or "non-core" matter.  Accordingly, this factor is neutral.

(viii) The Feasibility of Severing State Law Claims from Core Bankruptcy Matters to Allow Judgment to be Entered in State Court and Enforced in Bankruptcy Court: The Amended Complaint alleges one cause of action, a state law breach of contract.  Thus, it is possible for the Court to abstain and allow a state court to decide the entire case.  This factor favors abstention.

(ix) The Burden on the Court's Docket: The burden on the Court's docket is neutral.

(x) The Likelihood that Commencement of the Proceeding in Bankruptcy Court Involves Forum Shopping:  The terms of the Forward Swaps confer non-exclusive jurisdiction to United States District Court for the Southern District of New York and the New York State courts.[122]  Therefore, BofA argues, the parties to the Forward Swaps contemplated that disputes under the agreements would be resolved in jurisdictions outside of Delaware, including New York.  However, it can just as easily be argued that because the New York jurisdiction was non-exclusive, the parties contemplated resolving disputes in Delaware as well Moreover, this proceeding was filed in the court in which the debtors' chapter 11

---

[122] Amended Complaint, Exhibit C, p. 13 (§ 13(b)) and Exhibit D, p. 13 (§ 13(b)).

case is pending.  Had the debtors filed the proceeding in a forum other than that in which the debtors' chapter 11 cases are pending it might have been due to forum shopping.  As such, there is no evidence of forum shopping by the Plaintiffs.  Furthermore, there is a strong presumption in favor of the plaintiff's choice of forum.[123]  Accordingly, this factor weighs against abstention.

(xi) The Existence of the Right to a Trial by Jury: The parties agree that they contractually waived the right to a jury trial.  This factor weighs against abstention.

(xii) The Presence of Non-Debtors in the Proceeding:  In this proceeding, three of the four litigants are non-debtors.  This factor favors abstention.

In conclusion, six factors weigh against abstention; two factors are neutral; and four factors weigh in favor of abstention.  Thus, the totality of the circumstances weighs against discretionary abstention.  Furthermore, considering the effect this adversary proceeding may have on the debtors' claims process, it is significantly more efficient to administer the entire process in this Court and it would be an additional and unnecessary burden on the debtors' estate for this Court to abstain.  It is also particularly significant that there is no pending proceeding in state court or other non-bankruptcy court.  Thus, the Court will not abstain from this adversary proceeding.

---

[123] *Hopkins v. Plant Insulation Co.*, 342 B.R. 703, 715 (D. Del. 2006).

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss will be granted in part and denied in part.  Specifically, the Motion to Dismiss will be denied to the extent it argues that the Court does not have subject matter jurisdiction over this adversary proceeding, and it is granted to the extent it argues that AHMSI does not have standing to pursue this action.  Additionally, the Court will not abstain from considering the Amended Complaint under 28 U.S.C. § 1334(c)(1).